# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | |
|---|---|
| PENNSYLVANIA WOOD, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:13-CV-834-MGG |
| ) | |
| ANDREW G. MARTIN d/b/a MT Leasing, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

On February 28, 2017, Plaintiff Pennsylvania Wood, Inc. ("PA Wood") filed its Motion for Partial Summary Judgment [DE 94]. On the same day, Defendants Andrew G. Martin d/b/a MT Leasing ("A. Martin") and Susie Martin ("S. Martin") filed their Motion for Summary Judgment [DE 96]. PA Wood's motion became ripe on April 28, 2017, after Defendants filed their response brief [DE 101] and PA Wood filed its reply [DE 106]. Defendants' motion also became ripe on April 28, 2017, after PA Wood filed its response brief [DE 103] and Defendants filed their reply [DE 107].

The Court issues the following opinion and order resolving both motions for summary judgment as discussed below pursuant to the consent of the parties and 28 U.S.C. § 636(c). For the reasons stated below, the Court grants summary judgment to S. Martin on all three counts. The Court also denies summary judgment to PA Wood and A. Martin on Counts I and II.

## I. RELEVANT BACKGROUND

### A. Procedural Posture

On August 14, 2013, PA Wood filed its initial complaint bringing breach of contract and conversion claims against A. Martin. PA Wood added S. Martin as a defendant alleging claims

of breach of contract, conversion, and negligence against her through its second amended complaint, filed with the Court's permission on January 10, 2014.  Defendants proceeded *pro se* in this action until October 5, 2015.  With the Court's permission, PA Wood then filed its Fourth Amended Complaint on November 10, 2015.  Defendants filed their answer on November 14, 2015.  PA Wood's Fourth Amended Complaint remains operative and is the subject of the parties' instant motions for summary judgment.

Through the instant diversity action, PA Wood—a company that designs and sells high-end, handmade wood furniture—raises a breach of contract claim against both Defendants (Count I), common law and statutory criminal conversion claims against both Defendants (Count II), and a negligence claim against S. Martin (Count III).  PA Wood's claims arise from its commercial lease to store a large quantity of its inventory of furniture at a warehouse owned by Defendants.  PA Wood alleges that its furniture was damaged due to Defendants' negligent failure to keep the warehouse in good repair in violation of the lease and that Defendants appropriated some of its furniture in the warehouse for their own personal use and authorized sale of other furniture without its consent.

Jurisdiction is proper in this action under 28 U.S.C. § 1332(a) because it is between citizens of different states[1] and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

---

[1] PA Wood is a citizen of North Carolina based upon its incorporation and principal place of business in that State while Andrew and Susie Martin are both citizens of the State of Indiana based upon their domicile.

**B.	Facts**

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

Andrew and Susie Martin purchased a building ("the Warehouse") in Goshen, Indiana, on August 11, 2006. Before and after the purchase, only A. Martin communicated and negotiated with the seller and only A. Martin inspected the Warehouse. Nevertheless, the Warehouse is titled to "Andrew G. Martin and Susie Martin, husband and wife."[2] [DE 97 at 5]. The Warehouse consists of three main adjoining and interconnected structures. In early 2009, A. Martin and Donald S. Mathews, PA Wood's President, signed a Commercial Real Estate Lease ("the Lease") through which PA Wood leased the west half of the Warehouse's South Building to store its inventory of wood furniture. [DE 95-2 at 7]. S. Martin did not sign the Lease.

The initial term of the Lease ran from April 1, 2009, through April 1, 2010. [*Id.* at 2, ¶ 2]. However, the Lease also provided that PA Wood, as the Lessee, had the unconditional right to renew the lease for an additional three years. [*Id.*]. PA Wood did not formally exercise the option to renew the Lease, but continued to occupy the Warehouse after the initial term ended on April 1, 2010.

PA Wood stored its furniture in the Warehouse from February 2009 until April 2012. The Lease required PA Wood to make rental payments on the first of each month without notice or demand. [*Id.*, ¶ 3]. Yet PA Wood withheld rent and utility payments during three periods. PA Wood did not pay rent and utilities from August until December 2010 alleging rodent

---

[2] Real property owned as "husband and wife" is considered to be held as "tenants by the entirety." *Powell v. Estate of Powell*, 14 N.E.3d 46, 48 (Ind. Ct. App. 2014) ("[T]enancy by the entirety, can exist between only a husband and wife.")

3

problems that are not at issue in this case. PA Wood paid off the arrearage in December 2010, but then withheld rent and utilities again from January until September 2011 due to moisture issues that caused mildew and moisture-related swelling of PA Wood's furniture. After reaching an agreement with A. Martin, PA Wood paid off its balance in September 2011 to gain access to and remove part of its furniture inventory from the Warehouse to mitigate its damages resulting from the moisture issues. After September 2011, however, PA Wood did not remove any more furniture and paid no more rent or utilities through April 2012 when A. Martin removed some of the remaining furniture for his personal use, authorized Tamarack Auction to sell the rest of the furniture, and leased the Warehouse space to Tamarack.

Mathews and A. Martin began discussing the moisture issues at the Warehouse sometime before April 2011 when Mathews first learned about the water damage to the stored furniture. When Mathews initially informed A. Martin about the moisture issues, he suggested that the roof was likely leaking. A. Martin then inspected the roof and determined that the roof was not leaking despite noticing mold, mildew, and moisture on the interior concrete floor in the Warehouse. Significantly, A. Martin saw sagging ceiling tiles and a small puddle of standing water on the floor in the Warehouse during his inspection. Yet A. Martin did not contact a professional to inspect the roof and did not report back to Mathews about the roof.

Later, a local PA Wood furniture manufacturer visited the Warehouse with A. Martin to inspect the furniture inventory. During that inspection, PA Wood's manufacturer showed A. Martin moisture-damaged furniture. On his own, A. Martin noticed mold and mildew on both the furniture and the Warehouse structure itself as well as the odor of mold and mildew inside the Warehouse. Yet A. Martin did not address the moisture issues despite his own inspection and after receiving multiple requests from PA Wood.

4

With no abatement of the moisture problems, Mathews decided to remove the furniture from the Warehouse and transport it back to PA Wood's North Carolina location. Mathews sent a letter to A. Martin dated June 6, 2011, discussing arrangements for payment of the withheld rent and requesting further discussion to solve the moisture issues. [DE 95-4 at 2]. Based on that exchange, A. Martin granted PA Wood access to the Warehouse for removal of the furniture. PA Wood, however, realized that they did not have enough storage space in North Carolina to accommodate the full inventory and so made arrangements for a sixty-day inventory clearance sale of part of the furniture once it arrived in North Carolina.

With plans for the clearance sale in place, PA Wood sent workers and trucks to the Warehouse in August 2011 to pick up for the first load of furniture. The workers observed further signs of moisture damage including water stains on the floor and walls, many collapsed ceiling tiles, mold and mildew covered furniture, and swollen panels and cabinet doors causing cracking and warping of the furniture and making doors inoperable. Unable to remove all the furniture, the workers removed the furniture that appeared to be in the direct path of the water intrusion leaving the remaining furniture around the periphery of the Warehouse space. In North Carolina, PA Wood's attempts to clean and dry the furniture met with little success and the clearance sale ended thirty days early.

In September 2011, PA Wood sent another truck and crew to pick up a second load of furniture and document the ongoing moisture damages to the walls, ceiling, and floor of the Warehouse. Lacking sufficient space in North Carolina to store the second load with the unsold furniture from the first load, PA Wood rented an additional space and leased two commercial dehumidifiers in an attempt to mitigate the moisture-related damage to the furniture that it had retrieved. Mathews then informed A. Martin of the severity of the damage to the furniture and

again asked that the suspected roof leak be repaired to prevent further damage to the inventory remaining at the Warehouse. The remaining furniture included component pieces of larger pieces that had already been transported to North Carolina.

After September 2011, Mathews and PA Wood received no further communications from A. Martin, not even monthly invoices like it had received before.[3] Mathews and PA Wood did not communicate with A. Martin either. Then in March 2012, A. Martin entered an agreement to lease the part of the Warehouse where PA Wood's furniture was stored to Tamarack Auction beginning in April 2012. Without PA Wood's knowledge or consent, A. Martin directed Tamarack to sell the remaining furniture. Before Tamarack's first auction, however, A. Martin removed some of PA Wood's furniture for his personal use unbeknownst to PA Wood.

Proceeds from Tamarack's first auction amounted to about $4,000.00, a percentage of which A. Martin paid Tamarack for its services. Tamarack held subsequent auctions selling more furniture, including the component pieces of the larger pieces already relocated to North Carolina. In addition, PA Wood's metal shelving and racking units, installed to store its inventory, were removed from the Warehouse and are unaccounted for at this time.

**II.     ANALYSIS**

   **A.     Summary Judgment Standard**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

---

[3] A. Martin had previously sent monthly invoices, even though the Lease did not require it, largely because the utilities payments varied each month. [*See* DE 95-2 at 2, ¶ 3].Notably, the April 2011, May 2011, and August 2011 invoices, sent before PA Wood paid up its arrearage in September 2011, included warnings that if the rent was not brought current, a. Martin would sell some of the furniture inventory and consider it abandoned. However, the early 2011 invoices were evidently not received by PA Wood because of fax problems.

law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

### B. Susie Martin is entitled to judgment as a matter of law on PA Wood's breach of contract, conversion, and negligence claims against her because of a lack of evidence showing an agency relationship between her and Andrew Martin.

Defendants argue that summary judgment in favor of Susie Martin is proper on all claims because she was not involved in any of the events giving rise to PA Wood's claims in this action. S. Martin admits that she is a co-owner of the Warehouse with her husband, A. Martin, as tenants by the entirety. However, other undisputed facts bring into question whether S. Martin had any contractual or common law duty to PA Wood as an owner of the Warehouse. Moreover, PA

7

Wood has not presented evidence from which a fact finder could reasonably find that S. Martin appropriated any of PA Wood's property. As a result, PA Wood's attempt to establish that A. Martin and S. Martin were in an agency relationship from which A. Martin's conduct could be attributed to S. Martin is unsuccessful.

"Merely owning property jointly as a cotenant does not ordinarily bind the other cotenants by contracts with third persons, unless he is duly authorized, or unless thereafter they ratify his act." *Bayes v. Isenberg*, 429 N.E.2d 654, 659 (Ind. Ct. App. 1981). In fact, a "tenancy by the entirety is not such an 'entity' that one co-tenant can, by that co-tenancy alone, bind, represent, or otherwise obligate the tenancy by the entirety." *Idlewine v. Madison Cty. Bank & Trust Co.*, 439 N.E.2d 1198, 1201 (Ind. Ct. App. 1982). However, a husband may act as an agent for his wife. *Downham v. Wagner*, 408 N.E.2d 606, 613 (Ind. Ct. App. 1980). "If a husband and wife are engaged in a joint enterprise, agency will attach." *Bradford v. Bentonville Farm Supply, Inc.*, 510 N.E.2d 745, 747 (Ind. Ct. App. 1987) (citing *Downham*, 408 N.E.2d at 613). Agency between a husband and wife "may [also] arise by implication and be shown by circumstantial evidence." *Bayes*, at 658 (quoting *Downham*, 408 N.E.2d at 613). In the end, however, neither marriage nor co-tenancy alone create an agency relationship between spouses even though the marriage relationship may be considered when determining whether agency exists. *Bradford*, 510 N.E.2d at 747.

Here, the record includes no evidence that S. Martin was in any way involved in any direct negotiations with PA Wood regarding the Lease. The parties cannot dispute that S. Martin did not sign the Lease. Similarly, the record includes no evidence that A. Martin even informed S. Martin about the Lease, the moisture issues in the Warehouse, his interactions with PA Wood, or his decision to take some of PA Wood's furniture for personal use and sell the rest. Instead,

PA Wood relies on circumstantial evidence from which it expects the Court to imply an agency relationship that could bring S. Martin into this lawsuit.

Specifically, PA Wood argues that S. Martin was involved in the financial affairs of MT Leasing, the business entity that leased the Warehouse to PA Wood and others, based on (1) her co-ownership of the Warehouse; (2) the automatic deduction of monthly mortgage payments for the Warehouse from the joint bank account she shares with A. Martin; (3) the operation of the MT Leasing and Martin Truss businesses, including in-person meetings regarding the Lease with PA Wood, from the Martins' home; and (4) MT Leasing's use of the Martins' joint bank account for its business purposes rather than a separate bank account. PA Wood also suggests that S. Martin has benefited from the income derived from MT Leasing and from the use PA Wood's furniture that A. Martin took for personal use. None of this adds up to agency, however.

Indeed, PA Wood has presented no evidence that S. Martin was even aware of the Lease and A. Martin's interactions with PA Wood. In Indiana, "[a] wife is not liable on contracts entered into by her husband with third persons" and "neither a wife nor her property is liable for the individual debts of her husband." *Bradford*, 510 N.E.2d at 747.

Furthermore, the record includes no evidence that S. Martin ever visited, let alone inspected, the Warehouse. As such, nothing besides PA Wood's bald allegations suggest that S. Martin was aware of the moisture issues at the Warehouse or the alleged structural defects allowing the damaging water intrusion. Admittedly, a property owner, like S. Martin, cannot insulate herself from liability to a lessee for negligence in leasing the premises in an inhospitable condition by virtue of the public policy based exceptions to the general rule of *caveat emptor*. See *Chrysler Corp. v. M. Present Co.*, 491 F.2d 320, 325 (7th Cir. 1974); *Walker v. Ellis*, 129 N.E.2d 65 (Ind. Ct. App. 1955). Yet the property owners in *Chrysler* and *Walker* were aware

9

that their property was being leased. Here, PA Wood has not shown that S. Martin was aware of or in any way involved in the Lease to establish a duty under a theory of premises liability.

Similarly, PA Wood has presented no evidence that S. Martin participated or even knew about A. Martin's decision to take PA Wood's furniture. No doubt S. Martin was aware of the furniture when it arrived at her home. In addition, it is reasonable to infer to that she benefited from the use of the furniture and even the profits from the PA Wood Lease. However, PA Wood cites no authority showing that such a benefit alone without any direct participation constitutes the appropriation of property necessary to succeed on a common law conversion claim. *See Dominack Mech., Inc. v. Dunbar*, 757 N.E.2d 186, 188–89 (Ind. Ct. App. 2001). Without any evidence of S. Martin's direct involvement in taking the furniture, PA Wood similarly cannot show that S. Martin knowingly or intentionally exerted unauthorized control over PA Wood's furniture as is required to succeed on a statutory criminal conversion claim. *See* Ind. Code § 35-43-4-3; *see also* Ind. Code § 35-41-2-2(a) ("A person engaged in conduct "intentionally" if, when he engaged in the conduct, it is his conscious objective to do so."); Ind. Code § 35-41-2-2(b) ("A person engaged in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so.").

Without further evidence of agency between A. Martin and S. Martin and any direct participation in the Lease or the decision to take PA Wood's furniture, no reasonably fact finder could conclude that S. Martin breached the Lease, committed conversion, or was negligent in the maintenance of the Warehouse. With no genuine dispute of material fact, S. Martin is entitled to judgment as a matter of law on all claims against her.

C. **Andrew Martin is not entitled to judgment as a matter of law on PA Wood's breach of contract claim because genuine disputes of material fact exist as to whether A. Martin breached his maintenance duty, which affects the applicability of the Lease's exculpatory clauses.**

Under the Lease, A. Martin was required to "maintain and keep in good repair the roof, outside walls and foundation of the leased premises and . . . be responsible for the maintenance and repair of all exterior and structural portions of the leased premises." [DE 95-2 at 4, ¶ 8(a)]. The Lease also expressly states that "lessee [*i.e.*, PA Wood] shall maintain and carry his own contents insurance, and lessor [*i.e.*, A. Martin] shall not be liable for loss or damage to Lessee's contents or stored materials." [DE 95-2 at 3, ¶ 5]. At the same time, the Lease requires A. Martin as Lessor to "pay for fire and extended coverage insurance on the leased premises." [De 95-2 at 3, ¶ 5]. The Lease also includes an exculpatory clause, which stated that A. Martin, as Lessor,

> shall not be liable for any damage resulting from the interruption of [PA Wood's] business caused by fire or other insurable hazards, whether or not attributable to the negligence of [A. Martin]; and [PA Wood] does hereby expressly release [A. Martin] of and from any and all liability for such damage.

[DE 95-2 at 6, ¶ 16].

Based on these Lease provisions, A. Martin argues that PA Wood's breach of contract claim for water damage to the furniture stored in the Warehouse cannot succeed. Indeed, parties to a contract are generally permitted to agree in advance that one party shall not be liable to the other for consequences of negligent conduct. *Marshall v. Blue Springs Corp.*, 641 N.E.2d 92, 95 (Ind. Ct. App. 1994). Such exculpatory clauses are, however, deemed "void as against public policy where there is unequal bargaining power between the parties." *Id.*

No reasonable argument can be made here for unequal bargaining power in favor of A. Martin. After all, PA Wood was a corporation with access to legal counsel at the time the Lease

11

was negotiated while A. Martin was an individual business owner with no representation. Consequently, the Lease's exculpatory clauses are presumptively valid. However, A. Martin's interpretation of the exculpatory clause overlooks important aspects of the Lease that bring into question the applicability of the exculpatory clauses to this situation.

Under Indiana law, the goal of contract interpretation is to ascertain the intent of the parties. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004). "The parties' intent in written contracts is determined by looking at the plain and ordinary meaning of the contract language." *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997); *see also T-3 Martinsville, LLC v. U.S. Holding, LLC*, 911 N.E.2d 100, 111 (Ind. Ct. App. 2009) ("A lease is construed in the same manner as any contract."). Contracts must also be considered as a whole so as to give effect to all the contract provisions without narrowly focusing on language taken out of context. *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 422 (Ind. Ct. App. 1984). Thus, the Court here must consider the meaning of the Lease as a whole, not just the language A. Martin contends releases him for liability for the moisture damage to PA Wood's furniture.

First, it is undisputed that the Paragraph 16 exculpatory clause in the Lease releases A. Martin from any liability for damage resulting from the interruption of PA Wood's business caused by fire or other insurable hazards, whether or not attributable to the negligence of A. Martin. Even assuming that PA Wood's business was interrupted by the moisture damage to its furniture, it is unclear from the record before the Court whether the moisture damage resulted from an insurable hazard. A genuine dispute of material fact exists as to whether the Warehouse suffered from structural defects, including roof damage, that caused the water intrusion that

12

damages PA Wood's furniture. In addition, no evidence has been presented to establish the insurability of the structural defects if they do exist.

Second, the lack of clarity as to the cause of the water intrusion creates a genuine dispute of material fact as to whether A. Martin breached his duty of maintenance and repair established in Paragraph 8(a) of the Lease requiring him to "maintain and keep in good repair the roof, outside walls and foundation of the leased premises." [DE 95-2 at 4]. A. Martin suggests that the exculpatory nature of Paragraph 16 and the Paragraph 5 requirement that PA Wood maintain contents insurance fully release him of liability for damage to PA Wood's furniture regardless of his duty to maintain the Warehouse in good repair. A. Martin goes further and argues that even a breach of the maintenance duty would not negate the exculpatory provisions of the Lease. This interpretation goes too far. If the Lease were to preclude liability even in the event of a breach of the maintenance duty, the exculpatory clauses would render the maintenance and repair provision meaningless. The parties could not have intended such an outcome.

In sum, the exculpatory clauses of the Lease are valid and could preclude a finding that A. Martin is liable for the damage to PA Wood's furniture.[4] However, whether A. Martin breached his contractual duty to maintain the Warehouse and keep it in good repair would determine the effect of the exculpatory clauses. With genuine disputes of material fact remaining as to the condition of the Warehouse premises and the cause of the damaging water intrusion at the Warehouse, the Court cannot make a legal determination at this time as to

---

[4] Additionally, under Indiana law, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of a duty that arises outside of a contract. *Magic Circle Corp. v. Crowe Horwath, LLP*, 72 N.E.3d 919, 924–25 (Ind. Ct. App. 2017) (citing *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 514–15 (Ill. 1994), *cert. denied*).

whether A. Martin breached his duty.[5] Therefore, A. Martin is not entitled to summary judgment on the breach of contract claim raised against him.

> **D. A genuine dispute of material fact as to whether PA Wood abandoned its furniture precludes summary judgment on PA Wood's conversion claims against Andrew Martin.**

PA Wood alleges that A. Martin committed both common law and statutory criminal conversion when he removed furniture from PA Wood's inventory for Defendants' personal use and authorized the sale of PA Wood's remaining inventory.[6] Indiana law has long defined common law conversion as:

> [t]he appropriation of the personal property of another to the party's own use or benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor or in withholding it from his possession under a claim and title inconsistent with the owner's.

*Dominiack Mech., Inc. v. Dunbar*, 757 N.E.2d 186, 188–89 (Ind. Ct. App. 2001).

To succeed on its common law conversion claim, PA Wood must establish that A. Martin appropriated PA Wood's personal property for his own benefit in exclusion and defiance of PA Wood's rights. *Shourek v. Stirling*, 621 N.E.2d 1107, 1109 (Ind. 1993). The essential elements of a conversion claim are "an immediate, unqualified right to possession resting on a superior claim of title." *Id.* Conversion is a strict liability tort, therefore, the actor's intent and

---

[5] A. Martin also argues that PA Wood cannot invoke the protections of the Lease, particularly the maintenance and repair provision, because it abandoned the Lease. A genuine dispute of material fact exists as to PA Wood's abandonment and is discussed below in detail. The Court need not develop the abandonment issue here because other genuine disputes of material fact preclude summary judgment on the breach of contract claim.

[6] A. Martin argues that PA Wood failed to adequately plead common law conversion in Count II of its Fourth Amended Complaint. A. Martin notes that the caption in Count II references both statutory (or criminal) conversion and common law conversion but that the rhetorical paragraphs included in Count II only reference statutory conversion. Accordingly, A. Martin suggests that he lacked notice of the common law conversion claim and that summary judgment is therefore precluded. *See Wiesmuller v. Kosobucki*, 667 F. Supp. 2d 1001, 1003 (W.D. Wis. 2009); *Wislocki-Goin v. Mears*, 831 F.2d 1374, 1381 (7th Cir. 1987). Yet PA Wood's Count II explicitly incorporates all the preceding rhetorical paragraphs, which set out allegations consistent with a common law conversion claim. Therefore, the denial of summary judgment on the common law conversion claim is not based on the sufficiency of the pleading.

14

knowledge are irrelevant to liability. *Kozma v. Medtronic, Inc.*, 925 F. Supp. 602, 611 (N.D. Ind. 1996) (citing *Computers Unlimited v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995) ("Mens rea . . . is not an element of tortious conversion . . . . Good faith is no defense.")). Thus, to prove its claim for tortious conversion, PA Wood needs to show that it retained ownership, or superior title, to the furniture and that A. Martin's conduct deprived PA Wood of its rights to its furniture.

Statutory criminal conversion in Indiana occurs when "[a] person . . . knowingly or intentionally exerts unauthorized control over property of another person . . . ." Ind. Code § 35-43-4-3. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2 (a); *see also Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 758 (Ind. Ct. App. 2005). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2 (b); *see also Jamrosz,* 839 N.E.2d at 758. In order to prevail on a claim of statutory criminal conversion, "the plaintiff must show that the defendant was aware that there was a high probability that its control over the property was unauthorized." *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, 977 N.E.2d 354, 364 (Ind. Ct. App. 2012). In other words, PA Wood also needs to show that it retained ownership over the furniture that A. Martin allegedly appropriated without PA Wood's knowledge or consent to succeed on its statutory criminal conversion claim.

Since ownership is a necessary element for both common law and statutory conversion, there is no liability for conversion where the property in question has been abandoned. *See generally Right Reason Publ'ns v. Silva*, 691 N.E.2d 1347 (Ind. Ct. App. 1998); *see also McDonald v. McDonald*, 631 N.E.2d 522, 523 (Ind. Ct. App. 1994). Under Indiana common

15

law, "[a]bandonment has been defined as the relinquishment of property to which a person is entitled, with no purpose of again claiming it, and without concern as to who may subsequently take possession . . . ." *Right Reason Publ'ns*, 691 N.E.2d at 1351 (quoting *Schaffner v. Benson*, 166 N.E. 881, 883 (1929)). As a result, abandonment requires both an intention to abandon and an actual relinquishment of the property. *Id.* "An intention to abandon property . . . may be inferred . . . from the surrounding circumstances, and it can be shown by acts and conduct clearly inconsistent with any intention to retain and continue the use or ownership of the property . . . ." *Id.* (internal quotations omitted). Abandonment divests a property owner of his ownership barring him from further claim to it although he too can appropriate the abandoned property if no else has appropriated it. *Id.*

Here, A. Martin argues that PA Wood had divested itself of ownership of furniture remaining in the Warehouse on April 1, 2012. A. Martin contends that he decided to appropriate the furniture based on the assumption that PA Wood no longer retained ownership and superior title to it. In support, A. Martin cites to undisputed facts that arguably could be inconsistent with any intention on PA Wood's part to maintain ownership of the furniture. For instance, about six months had passed without any rent or utility payments from PA Wood. No one from or representing PA Wood returned to Warehouse after September 2011 to pick up the remaining furniture. A. Martin received no communications from PA Wood regarding its intentions for the furniture. Moreover, A. Martin received no communication from PA Wood suggesting that it was interested in extending the Lease. As a result, A. Martin assumed that the Lease expired on March 31, 2012, and that the remaining furniture could be used to cover the rent PA Wood had not paid.

PA Wood, on the other hand, cites to different undisputed facts in support of its contention that it did not abandon its ownership of the furniture. For instance, PA Wood received no communication from A. Martin informing it of his intention to terminate the Lease. Similarly, PA Wood received no monthly invoices for rent and utilities from A. Martin after September 2011. PA Wood had not made regular rent payments throughout the course of the Lease because of the water intrusion issue at the Warehouse that it contends should have been, but was not, resolved by A. Martin. These facts, and probably others, allegedly led PA Wood to assume that the Lease remained in force and it retained ownership of the furniture.

Further evidence in the record, such as the Lease's Paragraph 2 renewal provision and its Paragraph 3 provision that A. Martin was not required to send invoices for rent and utilities, could probably accentuate the scope of the parties' dispute on the factual question of whether PA Wood abandoned the Lease and its furniture. Regardless, the question of abandonment is clearly disputed by the parties and is material to PA Wood's conversion claims. A. Martin cannot be liable for common law conversion of the furniture if PA Wood forfeited its ownership rights through abandonment. Similarly, A. Martin could not knowingly or intentionally exert unauthorized control over the furniture, as required under the criminal conversion statute, if he acted under the good faith assumption that PA Wood had abandoned its rights to the furniture.

In light of the parties' genuine dispute of material fact as to ownership and abandonment, neither party is entitled to summary judgment on the common law and statutory criminal conversion claims set forth in Count II of PA Wood's Fourth Amended Complaint.

### III. CONCLUSION

For the reasons stated above, the Court

1. **GRANTS** Defendants' motion as to Defendant Susie Martin on all three counts [DE 96];

2. **DENIES** Defendants' motion as to Defendant Andrew G. Martin d/b/a MT Leasing on PA Wood's breach of contract (Counts I) and conversion (Count II) claims [DE 96]; and

3. **DENIES** PA Wood's motion as to Defendants Andrew and Susie Martin on its conversion (Count II) claims [DE 94].

The Clerk is **INSTRUCTED** to enter judgment in favor of Defendant Susie Martin on all counts.

PA Wood's breach of contract (Count I) and conversion (Count II) claims against Defendant Andrew Martin d/b/a MT Leasing will proceed to trial as scheduled on **June 20, 2017**.

    **SO ORDERED.**

    Dated this 8th day of June 2017.

                                                          s/Michael G. Gotsch, Sr.
                                                          Michael G. Gotsch, Sr.
                                                          United States Magistrate Judge